Request of Governor and Council,
No. 4990.

OPINION OF THE JUSTICES.

Submitted September 8, 1961.

Answer returned September 22, 1961.

The following resolution adopted by the Governor and Council on August 30, 1961, was filed in this court on August 30, 1961:

"WHEREAS, under the provisions of chapter 264, Laws 1961, we established priorities of certain projects set forth in the capital budget at the regular meeting of Governor and Council held at the Executive Council Chambers on July 14, 1961; and

"WHEREAS, under the provisions of chapter 263, Laws 1961, we have before us this date for approval and authorization to proceed from the Forestry and Recreation Commission the initial set of projects favorably considered by said Commission and submitted to Governor and Council; and

"WHEREAS, chapter 266, Laws 1961, authorizes the construction of an Archives and Records Center and the priority of this project was approved at the regular meeting of Governor and Council held at the Executive Council Chambers on July 28, 1961; and

"WHEREAS, it is necessary to borrow upon the credit of the State in order to provide funds to carry out the purposes set forth in the following chapter of Laws 1961:

"(1)   Chapter 263, 'An Act to provide for expansion of the state park system.'

"(2)   Chapter 264, 'An Act making appropriations for capital improvement, long term repairs and deferred maintenance for The State of New Hampshire.'

"(3)   Chapter 266, 'An Act establishing a division of records management and archives.'

"WHEREAS, the State Treasurer under the direction of the Governor and Council is authorized to issue bonds in the name of the State for the purposes set forth in chapters 263, 264 and 266 of Laws 1961; and

"WHEREAS, doubt exists as to the validity of the enactment of chapters 263, 264 and 266 of Laws 1961; and

"WHEREAS, in view of the circumstances we are in doubt as to our power to authorize the issue of said bonds;

"Resolved by the Governor and Council assembled in executive

session, that the opinion of the Justices of the Supreme Court be respectfully requested upon the stated questions arising out of the following facts:

"Chapter 266, Laws 1961, 'An Act establishing a division of records management and archives,' was duly passed by the House of Representatives and the Senate. It was presented to the Governor by the Secretary of State at 2:13 P. M. on June 30, 1961. Subsequent to final adjournment of the House of Representatives and Senate, it was signed by the Governor on July 6, 1961. Said time and dates appear on the certified copy of the law enclosed herewith.

"Was chapter 266, Laws 1961, 'An Act establishing a division of records management and archives,' constitutionally enacted?

"Chapters 263 and 264, Laws 1961, were duly passed by the House of Representatives and Senate in the manner and form as set forth in the Journals of the respective Houses, enclosed herewith. These chapters, originated as House Bills 377 and 483, were stamped on the reverse side of said Bills as being presented to the Governor on June 31, 1961, at 11:56 A. M. They were signed by the Secretary of State and transmitted by the Secretary, or a subordinate, to the Governor's office. Presentation to the Governor was recorded on the engrossed Bills as shown on the attached certified copies. The Journal of the House of Representatives, a copy of which is enclosed, indicates 'the House of Representatives adjourned at 11:55 o'clock on Saturday, July 1, 1961 . . . ' On the question of the difference in time between the time of final adjournment and presentation to the Governor, affidavits are herewith submitted to show that said Bills were in fact presented to the Governor prior to the final adjournment.

"Subsequent to final adjournment of the House of Representatives and Senate, the said Bills were signed by the Governor on July 6, 1961. Said time and dates appear on the certified copies of the laws, enclosed herewith.

"Were chapters 263, 'An Act to provide for expansion of the state park system,' and chapter 264, 'An Act making appropriations for capital improvements, long term repairs and deferred maintenance for The State of New Hampshire,' properly presented to the Governor in accordance with the New Hampshire Constitution and applicable statutes?

"Were chapters 263, 'An Act to provide for expansion of the state park system,' and chapter 264, 'An Act making appropriations for capital improvements, long term repairs and deferred maintenance for The State of New Hampshire,' constitutionally enacted?

"May the State Treasurer, pursuant to section 6, chapter 263, Laws 1961, issue bonds in the amount of Ten Million Dollars, or does the appropriation of section 5 of said Act limit the issue of said bonds to the sum of Nine Million Dollars?

"May the State Treasurer, with the approval of Governor and Council, borrow a total of $6,761,201 under section 10 of said chapter 264, or is said amount limited to the totals shown in figures as appropriated to named projects under sections 1 through 6 of said chapter 264, namely, $6,756,201?"

The following answer was returned:

*To his Excellency the Governor and the Honorable Council:*

The undersigned Justices of the Supreme Court submit the following answers to the inquiries contained in your resolution of August 30, 1961 relating to the enactment of chapters 263, 264 and 266 of the Laws of 1961, and the issue of bonds or notes under the first two of said chapters:

I. Your first question is: "Was chapter 266 Laws 1961, 'An Act establishing a division of records management and archives,' constitutionally enacted?" The resolution states as a fact that the bill which became chapter 266 was duly passed by the House and Senate, presented to the Governor on June 30, 1961, and was signed by him on July 6, 1961, after final adjournment of the Legislature. The occasion for the inquiry arises from the circumstance that the funds necessary to carry out the provisions of said act are to be derived from borrowings to be made under the direction of the Governor and Council through the issue of bonds, the terms of which are to be determined by that body. Laws 1961, 266:6.

One issue presented by the question is whether a bill may become law which is approved by the Governor after final adjournment of the Legislature. This question was expressly left undecided in *Opinion of the Justices,* 76 N. H. 601, 606, since the bill there under consideration had been approved by the Governor before adjournment. In the opinion returned, stress was laid upon the practice theretofore in effect under which no Governor had signed a bill after the Legislature had adjourned. That practice however has not uniformly continued, and numerous instances are to be found since 1911, of bills signed after adjournment of the Legisla-

ture, and thereafter accepted as law. One of the more notable examples was Laws 1934, chapter 3. The repeal of the Eighteenth Amendment to the Constitution of the United States took effect December 5, 1933. The Governor of New Hampshire on May 7, 1934 called a special session of the Legislature to consider appropriate legislation occasioned by this change in federal law. N. H. Manual for the General Court (1935) *p.* 94; House Journal, June 4, 1934, *p.* 110. The enactment of Laws 1934, chapter 3, establishing the State Liquor Commission was the result. The special legislative session adjourned on June 4, 1934. Chapter 3, and twelve other measures enacted at the session, were approved by the Governor on June 5, 1934, following adjournment.

The pertinent provisions of the Constitution appear in *Art.* 44, Part II, which provides as follows: "[Veto to Bills.] Every bill which shall have passed both houses of the general court, shall, before it becomes a law, be presented to the governor, if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it; if after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, together with such objections, to the other house, by which it shall likewise be reconsidered, and, if approved by two-thirds of that house, it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of persons, voting for or against the bill, shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it unless the legislature, by their adjournment, prevent its return, in which case it shall not be a law."

As appears from a reading of this Article, the last sentence is concerned with the effect of the failure of the Governor to take any action. A bill which is neither approved nor vetoed within five days becomes law at the end of that period, unless in the meantime the Legislature adjourns. If it does adjourn the bill cannot be "returned" and does not become a law without the Governor's signature.

The Constitution does not specifically grant or withhold the right of the executive to approve a bill after adjournment. On this precise subject it is silent. But the first sentence of Article 44

provides that "before it becomes a law" the Governor shall sign a bill "if he approve." No bill which he approves is required to be returned to the Legislature, and in practice none is returned. Article 44 attaches no significance to adjournment of the Legislature in the event the Governor thereafter approves a bill presented to him before the adjournment. We are of the opinion that his approval may constitutionally be given after adjournment.

Strong support for this view will be found in *Opinion of the Justices*, 334 Mass. 765, and *Hartness* v. *Black*, 95 Vt. 190, both of which involved constitutional provisions, analogous to ours. If a proposed law has the Governor's approval, we see no reason why the public will, expressed by those to whom the Constitution has entrusted the power to make the laws, should be frustrated because they have not remained in session to consider executive objections which are not offered. See *The People* v. *Bowen*, 21 N. Y. 517, 523. Approval of a bill by the executive after adjournment of the Legislature is a procedure sanctioned under the constitutions of a majority of the states. See anno. 64 A. L. R. 1468 and supplements; *Edwards* v. *United States*, 286 U. S. 482, and cases cited; I Sutherland, Statutory Construction (3d *ed.*) *s.* 1505.

In expressing the opinion that bills may be approved after adjournment we are fully aware of statements made in *Opinion of the Justices*, 76 N. H. 601, 609 to the effect that "the constitution for over a hundred years has been understood to mean that upon the adjournment of the general court by the governor the business of making law was ended for that session." While the Governor may properly be said to participate in the making of law (*The People* v. *Bowen, supra*) his function is limited to approval or disapproval of measures enacted by the General Court. Adjournment of the Legislature forecloses the amendment of bills to meet objections by the executive. But no reason appears to us to require a holding that it likewise forecloses his approval of bills passed by the Legislature, and presented to him before adjournment.

The argument has been advanced that the provisions of Article 44 should be construed to preclude approval of a bill by the Governor after prorogation, because Article 50 of the Constitution enables him to delay prorogation pending consideration of late enactments. It is likewise suggested that the right to approve enacted measures after adjournment might lead to the approval of defective bills, as the lesser of two evils. The latter argument was advanced in *The People* v. *Bowen, supra*, and answered by

reference to the power of the Governor under the Constitution to call the Legislature back into session. *Cf.* N. H. Const., Pt. II, *Art.* 50.

To countenance the argument that it was not intended that the Governor should approve bills after adjournment of the Legislature, because he is empowered to prolong the legislative session after its business is concluded, would hardly comport with the intention manifested by the recent amendment of Part II, Article 15th, to provide that no mileage shall be paid to legislators after ninety legislative days or July 1. N. H. Manual for the General Court (1961) *p.* 86; *Opinion of the Justices,* 103 N. H. 333.

Article 44 does indicate however, that the Governor is to be afforded "five days (Sundays excepted)" in which to determine his course of action with respect to bills duly presented to him. While he is not prohibited from approving such bills after adjournment, the intent that he should do so within five days after presentation is considered to be an implication of the Article. *Edwards* v. *United States,* 286 U. S. 482, *supra,* 491; I Sutherland, Statutory Construction, *supra, s.* 1505.

Thus we reach the question of whether approval was seasonably given by the Governor to the legislation in chapter 266, Laws 1961. In *Opinion of the Justices,* 45 N. H. 607, 613, the Justices considered the question of whether in computing the five-day period the day of presentation of the bill is to be included or excluded. Although their opinion upon the subject was not required, they pointed out that when Article 44 was approved (in 1792) the effective common-law rule required that the day of presentation be included. We see no reason at this time to re-examine this view. See *Opinion of the Justices,* 101 N. H. 536.

According to the record of the Secretary of State, the legislation which became chapter 266 was presented to the Governor on Friday, June 30 at 2:13 P. M. It was approved by him on Thursday, July 6. Between these days, July 2, a Sunday, and July 4, a legal holiday, intervened. RSA 288:1. Article 44 expressly excepts Sunday from the five-day period. If July 4 is likewise to be excluded the bill was seasonably approved; otherwise it was not.

The same issue was presented under the Massachusetts Constitution, and resolved in *Opinion of the Justices,* 291 Mass. 572. Although that Constitution contains no express exclusion from the period allotted for action by the executive, the Justices held that both Sundays and holidays should be excluded. Their opinion

pointed out that when the Constitution was adopted no provision existed for legal holidays although Sunday was strictly set apart by statute. The Justices reasoned that it was intended that the Governor should have five "secular" or "official" days when business ordinarily would be transacted" (*pp.* 576, 577), in which to consider legislation submitted for his approval and that therefore holidays and Sundays were to be excluded.

We are of the opinion that our Constitution should be similarly construed. Your question concerning chapter 266, Laws 1961 is answered in the affirmative. In our opinion the chapter was constitutionally enacted.

II.. In abbreviated form your second question is: "Were chapters 263 . . . and 264 . . . properly presented to the Governor in accordance with the New Hampshire Constitution and applicable statutes?"

The chapters in question originated as House Bills 377 and 483 respectively. The journals of both houses for June 30, 1961 show that the bills were passed by each house. Your resolution states that both bills "were stamped . . . presented to the Governor on June 31, 1961, at 11:56 A. M." Photostatic copies of the bills confirm this statement. As further stated by your resolution the Journal of the House for June 30, 1961 indicates that final adjournment of the House was at "11:55 o'clock on Saturday, July 1, 1961." The Senate Journal specifies no time of final adjournment.

Since the Constitution contains no provision relating to the time or manner of presentation of a bill to the Governor after its passage by the Legislature, this matter has come to be regulated by statute. RSA 14:9 provides: "PRESENTATION OF LEGISLATION FOR APPROVAL. After any bill or joint resolution requiring approval has been engrossed, and signed by the speaker of the house and president of the senate, it shall be presented by the secretary of state to the governor for his approval, and in his presence the secretary shall note thereon the day and hour of presentation for approval, and shall make a similar entry in the records of his office." So far as appears this statute was complied with.

Your second question is occasioned by the circumstance that the day and hour as recorded by the Secretary of State cast doubt upon whether the bills in question were presented to the Governor before final adjournment of the Legislature. That such presentation is required was the opinion of the Justices in *Opinion of the Justices,* 76 N. H. 601, previously referred to. It was there stated that "it

would require very express language to lead to the inference that the legislature, in providing for the presentation of bills to the executive, intended to authorize their presentation in such manner as to wholly deprive him of the power to aid in shaping legislation by calling attention of the legislature to defects in measures adopted by them." *Id.,* 606, 607. We accept this view as a premise from which your question is to be answered.

As was also pointed out in the same *Opinion of the Justices:* "in opinions of this character, the justices are not authorized to receive evidence or to determine questions of fact." *Id.,* 603. The journals of the two houses are to be accepted by the court as conclusive evidence of "the proceedings, and all public acts of both houses, of the legislature." Const., Part II; *Art.* 24th. *Opinion of the Justices,* 102 N. H. 230, 232, and opinions cited. We accept as a fact that the House of Representatives adjourned at "11:55 o'clock on Saturday, July 1, 1961." H. J. June 30, 1961, *p.* 86. We add that internal evidence found in the journals of both houses indicates that 11:55 in the forenoon was intended by the journal entry quoted above. The presentation of bills to the Governor however is a matter not recorded by the journals.

Certain arguments submitted to the court upon the questions contained in your resolution suggest that the accuracy of the hour stamped upon the bills which is understood to have been done by automatic timing device, has not been questioned and therefore should be accepted as conclusive of the time of presentation. Other argument suggests that we should accept certain evidence in the form of affidavits indicating that the House adjourned at 11:55 A. M. on July 1, the Senate at 12:05 P. M. on the same day, and that the bills in question were presented to the Governor before he appeared before the General Court sitting in joint convention, followed by his appearance before each house, to prorogue the session. See Const., Pt. II, *Art.* 50. For reasons previously indicated we may not utilize this evidence to find the facts.

Doubt concerning the date and time of presentation arises from the stamp upon the bills. Obviously the stamped recital that the bills were presented on June 31, 1961 cannot be accepted.

The House and Senate Journals indicate that final passage of the bills came in the early hours of July 1, and it has not been contended otherwise before us. Both houses adopted resolutions that they adjourn on July 1. The journals establish that the House did adjourn on that date, following the rising of the joint convention,

and that the Senate reassembled after the joint convention and finally adjourned following a brief address by the Governor and his proclamation of prorogation, already made before the House.

The submitted evidence that the bills in question were presented to the Governor on July 1 before prorogation of the General Court on the same day is thus contradicted only by the obviously inaccurate record made by a stamp. If we assume that the recorded date of June 31 was in fact July 1, as it must have been, it may likewise be that the time of presentation of the bills to the Governor was erroneously recorded as one minute later than the time of final adjournment of the House. We are not required to accept as accurate the record made by the Secretary of State's time stamp, and a comparison of his record with that of the House Journal may be considered inconclusive, particularly when so slight an interval is involved.

Other evidence presented with your questions is to the effect that the Secretary of State and his deputy, after stamping the two engrossed bills as presented to the Governor "at 11:56 A. M. on the morning of July 1, 1961," proceeded to Representatives Hall, arriving in advance of the Governor's appearance there to prorogue the House. This sequence of events should carry as much weight as the record of a time stamp not synchronized with legislative time.

We are of the opinion that none of the facts which we are bound to accept in answering your inquiry compel a negative answer to your second question. The acts have been duly engrossed, are "signed by the Speaker of the House of Representatives and the President of the Senate, and [have] upon [them] the approval of the Governor, attested by his signature. [They have] been published by authority as . . . public statutes enacted at that session. This, we have no doubt, must be regarded as *prima facie* evidence that [they] received the assent of the two branches of the Legislature, and the Governor, in the manner required by the Constitution to make [them] valid law[s] and statute[s] of the State." *Opinion of the Justices,* 35 N. H. 579. See also, *Opinion of the Justices,* 52 N. H. 622. The presumption of validity is not overcome by any binding evidence of the time of presentation. Neither the journals nor the facts assumed by your resolution require the conclusion that prorogation occurred before presentation of the bills to the Governor. Based upon such evidence as we may properly accept, and the presumptions which favor the acts, your second question is answered yes.

III. Your third question, in abbreviated form, is as follows: "Were chapters 263 . . . and 264 . . . constitutionally enacted?" So far as this inquiry raises the question of presentation of the bills to the Governor, and approval of the bills by the Governor within five days of such presentation although after adjournment of the Legislature, the question is answered in the affirmative for reasons already stated. The bills were presented to the Governor on July 1 and approved by him on July 6 so that the question of whether the intervening legal holiday as well as Sunday should be excluded in computing the five-day period established by Article 44 is not presented. Any additional questions with respect to the enactment of these bills which have been called to our attention relate to discrepancies in figures appearing in the bills and the validity of amendments acted upon by the Legislature during the closing hours of the session.

The journals of both houses for June 30, 1961 as they relate to the bills in question have been examined. No constitutional question with respect to enactment is apparent except with respect to H. B. 483, "An act making appropriations for capital improvements, long-term repairs and deferred maintenance for the State of New Hampshire," which became chapter 264, Laws 1961. On June 30, 1961 this bill was referred by both houses to a committee of conference after the House had voted not to concur in amendments adopted by the Senate, including an amendment which would have added a new subsection (IV) to section 7 of the bill. Thereafter the report of the conference committee was submitted to each house for action.

It is evident from the Senate Journal that one of the conferees on the part of the Senate considered that an amendment "relating to the transfer of funds" had been erroneously omitted from the committee report. S. J. June 30, 1961, *p.* 1043. Following discussion and a recess, the missing amendment was supplied. *Id., p.* 1044. As printed in the Senate Journal the report of the committee accordingly shows, as the last amendment appearing in the report, an amendment of section 7 of the bill by which the new subsection IV already approved by the Senate before appointment of the committee, was added to the committee report.

Section 7 of the bill, which followed six sections containing appropriations, authorized the Governor and Council: to establish the priority of undertaking projects enumerated in the first six sections, (7 I); to "delete projects or parts of projects" when "for

the public good or . . . necessary to keep within the funds appropriated (7 II); and to enter into agreements with the Federal Government for federal funds for the purposes of the bill (7 III).

The amendment in question added authority "to transfer funds from any project named in section 1 hereof to any other project in said section only in the event of an unforeseen emergency need." (7 IV). The report of the committee of conference including the amendment to section 7 by which subsection IV was added to the bill was then duly approved by the Senate. S. J. June 30, 1961, p. 1044.

On the other hand the House Journal for June 30, 1961 shows that the report of the conference committee as submitted to the House did not contain the amendment to section 7. H. J. June 30, 1961, pp. 74-79. Reading of the report of the committee was dispensed with and the report as submitted was adopted. *Id.,* 80. Thus the House Journal indicates that section 7 IV was not passed by the House of Representatives. "We are unable to discover any thing in the journals which shows, or from which we are at liberty to infer, that the House concurred in the amendment" (*Opinion of the Justices,* 35 N. H. 579, 582) regardless of whether the joint committee intended that it should be included in its report to the House. We do not regard the statements made by individual Senators, as shown by the Senate Journal, as binding upon the court or the House, or as a substitute for adoption of the amendment by the House, not shown by the journal of the House itself.

This presents the question of whether section 7 IV and other sections of the bill were "so mutually connected with and dependent upon each other . . . as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect . . . would not pass the residue independently . . . ." *Opinion of the Justices,* 76 N. H. 601, 605, *supra; Williams* v. *State,* 81 N. H. 341, 353. By the first three subsections of section 7 both branches of the Legislature authorized the Governor and Council to establish the relative priority of the projects enumerated by six prior sections, and to delete any parts necessary to keep the projects within the appropriations, as well as to make agreements by which additional funds might be procured from the Federal Government. The further authority contemplated by subsection IV to transfer funds from one to another of only the projects specified in section one, and then "only in the event of an unforeseen emergency need" cannot reasonably be considered a necessary element of the capital

budget bill in view of the narrow and limited application of the subsection. *State* v. *Stevens*, 78 N. H. 268, 269. In our opinion subsection IV of section 7 is separable from the remaining provisions of the act, which are essentially independent thereof. See *Rosenblum* v. *Griffin*, 89 N. H. 314, 320.

You are accordingly advised that section 7 IV of chapter 264, Laws 1961 did not become law, but that the remaining provisions of the chapter were constitutionally enacted.

You are further advised in answer to your third question that chapter 263 (H. B. 377) was constitutionally enacted.

IV. Your fourth question is as follows: "May the State Treasurer, pursuant to section 6, chapter 263, Laws 1961 issue bonds in the amount of Ten Million Dollars, or does the appropriation of section 5 of said Act limit the issue of said bonds to the sum of Nine Million Dollars?"

As this question indicates, section 5 of chapter 263 appropriates a sum "not exceeding nine million dollars" for the expansion of the state park system as provided by the first four sections of the act. Section 6 of the act however authorizes the State Treasurer "under the direction of the Governor and Council" and "for the purpose of providing funds necessary for the appropriation made by section 5" to borrow "a total of ten million dollars" and 'for that purpose to issue bonds or notes, the terms of which are to be determined by the Governor and Council. The difference between the amount "not exceeding nine million dollars" appropriated by section 5, and the borrowing of a "total of ten million dollars" authorized by section 6, doubtless resulted from various amendments to the bill made at the conclusion of the session. A committee of conference report recommended a reduction from ten to nine million dollars in the appropriation (S. J. June 30, 1961, *p.* 1034; H. J. June 30, 1961, *p.* 71) but no corresponding change was made in the section authorizing bonds or notes. *Cf.* H. J. June 30, 1961, *p.* 54.

Since the maximum appropriation established by section 5 is nine million dollars, you are advised that the intent of the Legislature was to authorize the issue of nine rather than ten million dollars in bonds or notes "for the purpose of providing funds necessary for [this] appropriation" and "for the purpose of carrying into effect the provisions" of the act (*s.* 6).

The answer to your fourth question is that the appropriation of section 5 of chapter 263 limits the issue of bonds under that chapter to a maximum of nine million dollars.

V.  Your fifth question is as follows:  "May the State Treasurer, with the approval of the Governor and Council, borrow a total of $6,761,201 under section 10 of said chapter 264, or is said amount limited to the totals shown in figures as appropriated to named projects under sections 1 through 6 of said chapter 264, namely, $6,756,201?"

Section 1 of chapter 264, Laws 1961 contains the detailed appropriations for numerous capital improvements, long-term repairs or deferred maintenance for various state institutions and departments specified therein.  Certain of these figures were subjected to amendment as the legislative session drew to a close.  The grand total of the items is correctly shown at the end of section 1 as "$2,945,927."  Section 1 however provides at the outset for a total appropriation of "two million, nine hundred forty-nine thousand, nine hundred twenty-seven dollars" or $4,000 more than the total of the items stated in the section.

Additional appropriations are made by sections 2 through 6 of the act, some of which were likewise altered by amendment during the last days of the session.  If the total appropriation made by section 1 is accepted at the amount first stated, of $2,949,927, the total of all appropriations made by the first six sections of the bill is $6,761,201.

Section 10 of the act authorizes the State Treasurer under the direction of the Governor and Council to borrow this total amount through the issue of bonds and notes.  Section 14 of the act authorizes issuance in the same manner of short-term notes aggregating the same figure.  In both of these sections however the authorization is stated in terms of amounts corresponding to the separate appropriations contained in each of the first six sections of the act.  Both section 10 and 14 authorize the issue of securities of $2,949,927 to provide funds for the appropriation in that amount as first stated in section 1.

Thus the security issue authorized by the act for purposes of section 1, as well as the appropriation made by section 1 itself exceeds by $4,000 the itemized cost of the projects enumerated in the section.

It is not unlikely that the discrepancy arose out of reduction of the appropriation of $166,000 in paragraph VII of section 1 from a figure of $170,000.  S. J. June 30, 1961, *pp.* 1004, 1038; H. J. June 30, 1961, *pp.* 20, 75.  In any event there is no reason to assume that the Legislature intended to depart from the usual practice of

appropriating in total amount, the sum of the individual items set forth in the bill. *Cf.* Laws 1959, 297:1, 5, 9; Laws 1957, 293:1, **6,** 10. Moreover, the provisions of section 7(II) and (III) of the 1961 act, providing for deletion if "necessary to keep within the funds appropriated," and for agreements to secure federal funds, belie any purpose to appropriate in total amount any more than the total of the specific allotments made by the section.

You are accordingly advised that the controlling figure contained in section 1 of chapter 264 is $2,945,927 appearing at the end of the section, that the appropriation made by that section is in that amount, and that the authorizations to borrow which are contained in sections 10 and 14 of the act "to provide funds for the appropriation made in section 1" permit borrowing "not exceeding" the sum of $2,945,927.

A similar discrepancy appears in section 6 where "two hundred fifty-four thousand, six hundred sixty dollars" is appropriated, while the figure intended is correctly stated at the end of the section, and in sections 10 and 14, as $279,660. You are advised that the appropriation made by section 6 is $279,660. It is also evident that as a result of amendments to section 6 of the original bill, that section should have been enumerated in section 12 of the act, but was inadvertently omitted.

The answer to your question is that the total borrowing authorized by chapter 264, section 10 is $6,757,201.

FRANK R. KENISON.<br>
LAURENCE I. DUNCAN.<br>
EDWARD J. LAMPRON.

September 22, 1961.

*To His Excellency the Governor and the Honorable Council:*

We agree with all of the foregoing opinion except on the single issue of whether the House concurred with the Senate in the passage of the controversial amendment, *s.* 7 IV of *c.* 264, Laws 1961, known as H. B. 483, relating to the transfer of funds between projects named in *s.* 1 of the bill.

First, as stated in the majority opinion quoting approvingly from *Opinion of the Justices,* 35 N. H. 579, the act has been duly engrossed, "is signed by the Speaker of the House of Representatives

and the President of the Senate, and has upon it the approval of the Governor, attested by his signature. It has been published by authority as one of the public statutes enacted at that session. This, we have no doubt, must be regarded as *prima facie* evidence that it received the assent of the two branches of the Legislature, and the Governor, in the manner required . . . to make it a valid law and statute of the State."

Second, again as stated in the majority opinion, "The journals of the two houses are to be accepted by the court as conclusive evidence of 'the proceedings, and all public acts of both houses, of the legislature.'" Const., Part II, *Art.* 24th. *Opinion of the Justices,* 102 N. H. 230, 232, and opinions cited. "We may resort to them in this case to ascertain whether the two Houses in fact concurred in the passage of the before mentioned act." *Opinion of the Justices,* 35 N. H. 579, 581. In other words, these records are "binding on the public and the judiciary . . . . " *Opinion of the Justices,* 102 N. H. 230, 232.

In examining the records to determine whether the House did concur in the passage of *s.* 7 IV, the disputed amendment, the test we are to apply is to inquire whether there is "any thing in the journals which shows, or from which we are at liberty to infer that the House concurred" (*Opinion of the Justices,* 35 N. H. 579, 582), or whether there was anything to "indicate that they [the house] . . . in any way gave their assent, direct or implied, to the amendment . . . . " *Id.,* 583.

It seems clear that the journals contain evidence which compels us to conclude that the House concurred in the amendment and that they confirm the existing presumption of the validity of *s.* 7 IV.

Let us look at the record (which the majority opinion on this issue in large measure ignores) of what was said and done in both Houses, bearing in mind that we must consider the statements therein, and undisputed by anyone in either journal, as true. *Opinion of the Justices,* 35 N. H. 579; *Opinion of the Justices,* 102 N. H. 230, 232.

First, the House having originally refused to accept the amendment (House Journal, June 30, 1961, p. 26), a committee of conference from both House and Senate of which Representative King, the Democratic floor leader, was a member from the House, assembled and voted to adopt the amendment. S. J., June 30, 1961, *p.* 1042.

Representative King then returned to the House and after moving

to dispense with reading the entire committee report, he "explained the report" to the House, which adopted it. H. J., *p.* 80.

It then appeared that *s.* 7 IV, by an "error in typing," had been left out of the typewritten report. S. J., *p.* 1043. Upon this being called to the attention of the Senators, the President of the Senate addressed the members of that body: "The Speaker of the House has just spoken to me about this. The House is of the opinion that it was unintentionally left out and the Committee on Engrossed Bills can take care of it." S. J., *p.* 1043.

Senator Cheney then, to make assurance doubly sure, conferred with Representative King and reported to his Senate colleagues: "Mr. President, I have just checked with Representative King and he tells me that this was left out by mistake. There is no question but what the intent was to put it in. It was in the original bill." S. J., *p.* 1044.

The committee on engrossed bills then did take care of the situation. This is conclusively proved by the fact that H. B. 483, duly engrossed, does contain the amendment, and Mr. Shepard, a House member of this committee, reported to the House that his committee had "examined and found correctly engrossed the following entitled bill: H. B. 483, making appropriations for capital expenditures, long term repairs and maintenance for the State of New Hampshire." H. J. *p.* 82.

In the face of this record, we find it impossible to say that there is nothing in the journals from which we are "at liberty to infer" that the House concurred in passing the amendment or gave their assent "direct or implied" to its passage. *Opinion of the Justices,* 35 N. H. 579. Rather it seems to us that the presumption of validity which arose from the proper engrossing, signing and publication of H. B. 483, is conclusively established by the journals. We believe that the amendment, *s.* 7 IV, should have become law.

AMOS N. BLANDIN, JR.
STEPHEN M. WHEELER.

September 22, 1961.

Memoranda were furnished by the following:

*Upton, Sanders & Upton* for Monitor Publishing Co. and James M. Langley as *amici curiae.*

420

*Gardner C. Turner*, Attorney General, *Maurice J. Murphy, Jr.*, Deputy Attorney General and *Irma A. Matthews*, Law Assistant, for the State of New Hampshire.

*Robert S. Monahan*, Chairman Senate Committee on Engrossed Bills.

*Henry C. Newell*.

*Leon W. Anderson*.